Argued before SCOTT, P. J., and BISCHOFF and MacLEAN, JJ.

Bayard H. Ames and E. Merriam Bagg, for appellant.

Joseph M. Davis, for respondent.

BISCHOFF, J.   The plaintiff, when standing on the rear platform of the defendant's street car, was struck by the brake handle and injured; the motion of the brake handle having been caused by the rebound of the rear fender of the car, which had fallen to the street through the dislodgment of a nut whereby it had been attached to the car.

It was competent for the jury to find that the loosening of this nut was the proximate cause of the injury, and, since the nut had a necessary purpose in holding the equipment of the car together, the fact that it became loose and failed of its purpose justified an inference that it had not been properly secured in place—an omission which touched the defendant in its duty of care towards its passengers, since an insecure condition of the fender, with the car in motion, was reasonably to be deemed dangerous to passengers on the platform.   Within the rules applicable to cases of this kind, therefore, a cause of action was apparent, and the proof warranted a recovery unless the jury should accept as sufficient the defendant's evidence of its system of inspection, which they were not bound to do.   Palmer v. D. & H. C. Co., 120 N. Y. 170, 24 N. E. 302, 17 Am. St. Rep. 629.

The case of Kelly v. Railroad Co., 109 N. Y. 44, 15 N. E. 879, relied upon by the appellant, had to do with the proof necessary to sustain an action where the passenger's injury was due to a fall caused by catching her clothing in a broken hook of a window shade, and it was held that the defect was not sufficiently dangerous to require inspection and correction in avoidance of such an accident.   The circumstances of the accident in the case at bar involved an omission of care in the operative means of conveyance, and, for the reasons stated in the Palmer Case (at page 177 of 120 N. Y., page 304 of 24 N. E. [17 Am. St. Rep. 629]), the Kelly Case is clearly distinguishable.

Judgment and order affirmed, with costs.   All concur.

---

(110 App. Div. 779)

## CALLAHAN et al. v. O'ROURKE.

(Supreme Court, Appellate Division, Second Department.   December 29, 1905.)

1. SALE—ACCEPTANCE—COMPLAINTS.

Plaintiffs contracted to construct for defendant a system of machinery for ice making, and, after it was put together on defendant's premises, he examined and tested it 'for two months, and then set it at work in his own business, continuing it till the end of the season.   *Held*, that, notwithstanding the use of the machinery was accompanied by complaints that the work was imperfect, there was an acceptance, which waived all defenses to an action for the price which were not based on special warranties.

[Ed. Note.—For cases in point, see vol. 43, Cent. Dig. Sales, §§ 451–454.]

2. SAME—WARRANTIES—PERFORMANCE—EVIDENCE.

　　Evidence, in an action for the price of a system of machinery for ice making, *held* insufficient to show nonperformance of warranties as to workmanship, construction, material, aptitude of the details for the purposes intended, and capacity.

3. SAME—NEW AGREEMENT—REPAIRS—EVIDENCE.

　　Evidence, in an action for the price of a system of machinery sold by plaintiffs to defendant, *held* insufficient to show a new agreement made after the sale that defendant should make, at plaintiffs' expense, such repairs, additions, and changes as he might find necessary.

Appeal from Judgment on Report of Referee.

Action by William K. Callahan and another, as surviving partners of the firm of W. P. Callahan & Co., against John H. O'Rourke. From a judgment for plaintiffs, defendant appeals. Affirmed.

The following is the opinion of the referee:

The plaintiffs seek to recover upon a contract under which they have constructed for the defendant a system of machinery for ice making. The agreed price was $96.900 on which the defendant has paid $76,866.25. The defendant insists that the machinery was defective and was not in accordance with the contract, and that it did not conform to the warranties hereinafter specified. There are also counterclaims: First, that the defendant has expended, in attempting to remedy defects in the plaintiffs' construction, moneys which the plaintiffs agreed to pay and have not paid; and, second, that he, at the plaintiffs' request, rented and attempted to use the plant during the plaintiffs' endeavors to perfect it, and has suffered damage by reason of the failure of the apparatus to manufacture ice, as required by the contract.

Regarding the agreement apart from the warranties, and only as an undertaking to construct a system of machinery, there is no available defense. The plant was assembled and put in operation upon the defendant's premises in the summer of 1893, and it was operated until the winter, when it was suspended under the usages of the business. For at least two months prior to the latter part of October, 1893. the defendant had, and availed himself of, ample opportunity for its examination and test. He was a man of broad experience in practical mechanics, and it is not suggested that the conditions of the machinery were latent or uncertain. In the latter part of October, after a fair term of probation, he set the apparatus at work in his own business and for his own profit. It then passed from the dominion of the plaintiffs and became the defendant's property. This was an acceptance which, for the main purposes of the contract, waived all defects in the work, confessed the plaintiff's full performance, and fixed and determined that the defendant was liable for the unpaid balance of the price, subject to the terms of payment prescribed in the agreement. Brown v. Foster, 108 N. Y. 387, 15 N. E. 608.

True, this use of the machinery was accompanied by complaints that the work was imperfect, but in the case cited, which presents a circumstantial resemblance to the case at bar, it was said of like complaints by the vendee: "The complaints continued to October 10th. but so did his use of the machine, and later, until November 26th, when, the work on hand having been completed and the season over, the machinery was uprooted and stored, with ·notice to the defendants (vendors). If these things had been done at the moment of discovery that the machinery was not in compliance with the contract, the obligation of the plaintiff (vendee) would have been discharged. At the time when they were done the right of rescission had been lost. The continued use of the machine in the promotion of his own business interests, with knowledge of its imperfections, was an unequivocal act of acceptance which no words of his own could qualify." Acceptance, however, did not waive any defense based upon the specific warranties, and inquiry as to their breach is not thereby embarrassed, except so far as the acts, constituting acceptance for the purposes of the general agreement, may also suggest a concession on the defendant's part that the warranties had been fulfilled. The warranties invoked in defense are that the whole apparatus, as well as specific parts thereof, would develop a certain manufacturing capacity; that the work-

manship, construction, and material involved were first class; and that each detail thereof was adapted for the purpose intended. The evidence requires the finding that all these warranties were kept. The warranties as to workmanship, construction, and material, and the aptitude of the details for the purposes intended, will be first considered.

In the latter part of December, 1893, the defendant sent to the plaintiffs a written specification which he called a "list of wants to complete plant." The things wanted were proper adjuncts to the machinery, but they were not essential either to its operation or to its workmanship, construction, or material; nor did they show that the details of the machinery were not adapted to the purpose thereby intended. At this time the defendant had had time and opportunity for determining whether there were deficiencies in the plant, and it must be supposed that the list of wants specified every shortcoming which was then apparent. Those which were not then mentioned must be presumed not to have existed, and those which were mentioned were thereafter supplied, with the exception of a brass knob and an ornamental shield over a cylinder head. The plaintiffs' witnesses, who were engaged upon the construction, give credible testimony of the fulfillment of this warranty, and they are confirmed by the facts surrounding the acceptance. It is not intended to hold that acceptance has any effect to shut out inquiry as to whether or not the warranties were fulfilled, or that it is of any consequence in regard to the facts surrounding these warranties, except that, when there is a conflict as to the conditions to which the warranties relate, any declaration or concession by any of the parties, even though evinced only by their acts, is of the same grade of evidence as would be a declaration by words to the same effect. Such assurances become of especial weight when the subject of the warranties is open to inspection and its physical conditions are appreciable by a person of ordinary intelligence. Not only was this machinery subject to a scrutiny sufficient to discover to ordinary observation any mechanical or physical imperfection, but the defendant gave to it his attention and was well fitted to reach an understanding as to its condition.

It is hard to resist the conclusion that, when the defendant, in October, 1893, appropriated the plant to his own use, he thereby implied a conviction on his part and an assurance to his vendor that the warranties under consideration were performed, save for the details mentioned in the list of wants and thereafter supplied.

The warranty of capacity to make 110 tons of ice per day was, undoubtedly, postponed as to its operation and test beyond the time of acceptance, and the circumstances surrounding the acceptance have no bearing upon its breach of fulfillment. But in the summer of 1894 the parties joined in a test of the plant, avowing their purpose to determine whether or not it would make the required quantities and quality. This trial was conducted with sufficient care and solemnity; its records are in evidence; its results manifested the productive ability which the plaintiffs had warranted. Indeed, the power of the plant to fulfill this warranty was shown in its general operation apart from the test. In reaching these conclusions, it is not forgotten that the defendant's complaints continued, and that his original list of wants, when cured, were supplemented by additional statements of grievance. So far as his complaints affected the general liability, the case is as if there had been no semblance of deficiency; while with respect to the warranty no complaint of deficiency could contravene the demonstration of efficiency which was afforded by the behavior of the plant under the formal test and in its ordinary use.

In May, 1894, the defendant gave to plaintiffs, on account of the transaction in suit, his note for $15,385, which fell due about a month after the test of the machinery. This note was, in its inception, a confession of indebtedness and a request for indulgence. At its maturity the defendant paid a portion of the note, and availed himself of a renewal as to the remainder, and by many successive renewals the indebtedness was in part reduced and in part continued till November, 1895. The defendant's recognition of indebtedness and his requests for indulgence thereon support the determination that, whatever may have been the remaining imperfections of the machinery, its condition did not offend the warranties. The amount represented by these

notes was a portion of a sum which, under the expression of the contract, became payable "30 days after the completion of the plant." It is true that the contract provided that the payments thereby required were not to be evidence of the acceptance of the work, but it is not payment so much as his requests for indulgence from which the defendant's approval of the plant is to be deduced. In the snarl of conflicting evidence, which this case presents, it is easier to believe that these warranties had been performed to the defendant's satisfaction, than to accept a theory that, under circumstances of financial stress, continuing for many months, he would repeat his promise to pay for a work which, according to his convictions, so offended these warranties that the plaintiffs owed him a sum eventually more than the amount of the notes.

There is no proof or contention as to the counterclaim that under a rental from the plaintiffs the defendant attempted to make ice and suffered losses from the insufficiency of the plant. This claim is abandoned.

The remaining counterclaim is that under a new contract. imposed upon the original agreement, the plaintiffs authorized the defendant to make such repairs, additions, and changes as he might find necessary to perfect the plant, and promised to repay all expenditures to be made under such arrangement. This claim rests upon the testimony of the defendant of conversation with one of the plaintiffs, and in part upon the testimony of Mr. Ternes, the defendant's engineer. The senior Mr. Callahan, with whom these conversations were had, died after the giving of the testimony without having taken the stand in this cause. The testimony, if accepted, would indicate that men whose business was the building of ice-making systems, and who had previously set up many like plants which had been entirely successful in operation, would abandon their appropriate business, would confess their failure to manage their affairs and their breach of their contract, would turn over their duties and their interests to one who had no previous experience in such construction, and whose interests were inconsistent with their own, and would give to him an unmeasured authority to improve his own property at their expense, and to charge them with accounts, then uncalculated, and since found to be many thousands of dollars. The conversations as given are vague and indefinite. They lack contractual significance, and are without the detail and ceremony which would ordinarily surround a transaction involving so much of unlimited liability on the one part, and unhampered opportunity on the other. They are offered to establish a transaction of the sort which men usually want to define with great care and put in written form. The talk to which Mr. Ternes testifies is of no value upon the question whether or not Mr. Callahan had several months earlier made the promise alleged, and it is actually inconsistent with an already existing agreement. The interview to which Mr. O'Rourke refers took place in the summer of 1894. He says, "I think it may have been in June." In the previous December, the defendant had submitted his list of wants. The assertion of faults therein set forth and the subsequent correction thereof, together, indicate that in the following summer there was neither occasion nor probability of any agreement which contemplated large expenditures upon the machinery. The lapse of time since these conversations and the ardor of litigation suggest the likelihood of error. or unconscious extravagance in the testimony. This suggestion is reinforced by the fact that the defendant has shown a zeal in his own behalf which has led him into mistake, in part confessed by him with frankness, and in part disclosed by the circumstances or by further examination; nor can it be disregarded that the bill of particulars of this counterclaim contains charges for expenditures which were clearly not related to the building or perfection of the plant, but were current outlays necessary in the natural process of use, maintenance, and reparation.

These particulars cover payments made between January, 1894, and December, 1895. The account was constantly growing. It amounted to several thousand dollars early in 1895, and as early as October, 1895, nearly reached its final total of $13,000. Meanwhile, the defendant's note for $15,385 and its successors were running. The various renewals were attended by requests in which the defendant declared his financial inconvenience, promised payment by the next due date, made payments on account. and explained that his failure to take up the indebtedness was due to his inability to sell securities,

issued upon the enterprise which was based upon this plant, and other securities apparently not related thereto. In one instance, in asking for the reconsideration of a refusal to extend the note, he gives the grounds which in his judgment entitle him to indulgence, but he makes no intimation that the extension might well be accorded to one who held against the payee a substantial offset. It does not appear whether the defendant paid interest or bank discount upon the earlier renewals, but his last note was given to include interest. It is not rationally probable that this transaction continued for more than a year and a half and developed the features just described, without the assertion of a counterclaim, if there were between the parties an agreement under which the plaintiffs were indebted to the maker of the note in a constantly growing sum, finally larger than the note indebtedness and at all times of practical substance. There were repeated requests by the plaintiffs that the defendant would render to them his account. While nothing was said in the plaintiffs' letters as to the nature or the basis of this account, such requests, with all the circumstances and relations of the parties, give color to the possibility of an understanding that the defendant was permitted to make some disbursements on the plant at the plaintiffs' expense. But the probabilities fall short of any agreement comprehending the broad and extended charges now asserted, and in the breadth of the defendant's claim there is no evidence from which a contract for any specific or limited expenditure can be found.

In the absence of proof of the intention of the parties, the various payments made on the contract price should, under all the circumstances, be taken as applicable to the obligations remaining unpaid at the time of the payments respectively in the order of their maturity. Hence, as calculation shows, of the sum of $20,033.25, now unpaid, $653.25 is to be regarded as a part of the sum of $27,520, due 30 days after completion, viz., on December 1, 1893, and the balance, $19,380, must be considered as the last installment, which became payable four months after completion, viz., on March 1, 1894.

There should be judgment for the plaintiffs for $20,033.75, with interest on the parts thereof as above set forth, and against the defendant for the dismissal of his counterclaims. Counsel are requested to submit findings accordingly.

Argued before HIRSCHBERG, P. J., and BARTLETT, WOODWARD, JENKS, HOOKER, RICH, and MILLER, JJ.

James & Thomas H. Troy, for appellant.

Grout, Jenks, Mayer & Hyde, for respondent William K. Callahan.

PER CURIAM. Judgment affirmed, with costs, on the opinion of Herbert T. Ketcham, referee.

---

(109 App. Div. 798.)

## PHELPS v. CAMERON.

(Supreme Court, Appellate Division, Second Department. December 29, 1905.)

WILLS—CONSTRUCTION—DESIGNATION OF DEVISEES—LAWFUL ISSUE.

Testator's will directed that his estate be divided into as many parts as he had children, the income of each part to go to a child for life, and upon the child's death the part to be divided among the "lawful issue" of the child. At the time the will was executed several of testator's children were married and had children. *Held*, that the daughters of a deceased daughter and a grandchild of such daughter took equally under the clause "lawful issue."

Hirschberg, P. J., and Jenks, J., dissenting.

Appeal from Judgment on Report of Referee.

Action by Charles Henry Phelps, as one appointed to execute trusts